(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ALABAMA DEPARTMENT OF REVENUE ET AL. *v.* CSX TRANSPORTATION, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 13–553. Argued December 9, 2014—Decided March 4, 2015

Alabama imposes sales and use taxes on railroads when they purchase or consume diesel fuel, but exempts from those taxes trucking transport companies (motor carriers) and companies that transport goods interstate through navigable waters (water carriers), both railroad competitors. Motor carriers pay an alternative fuel-excise tax on diesel, but water carriers pay neither the sales tax nor the excise tax. Respondent (CSX), an interstate rail carrier that operates in Alabama, sought to enjoin state officers from collecting sales tax on its diesel fuel purchases, claiming that the State's asymmetrical tax treatment "discriminates against a rail carrier" in violation of the Railroad Revitalization and Regulation Reform Act of 1976, or 4–R Act, 49 U. S. C. §11501(b)(4). This Court held that a tax "discriminates" under subsection (b)(4) when it treats "groups [that] are similarly situated" differently without sufficient "justification for the difference in treatment," *CSX Transp.* v. *Ala. Dept. of Revenue*, 562 U. S. 277, 287 (*CSX I*). On remand, the District Court rejected CSX's claim. Reversing, the Eleventh Circuit held that CSX could establish discrimination by showing that Alabama taxed rail carriers differently than their competitors, but rejected Alabama's argument that imposing a fuel-excise tax on motor carriers, but not rail carriers, justified imposing the sales tax on rail carriers, but not motor carriers.

*Held:*

1. The Eleventh Circuit properly concluded that CSX's competitors are an appropriate comparison class for its subsection (b)(4) claim.

All general and commercial taxpayers may be *an* appropriate comparison class for a subsection (b)(4) claim, but it is not the only one. Nothing in the ordinary meaning of the word "discrimination" sug-

gests that it occurs only when the victim is singled out relative to the population at large. Context confirms this reading. The 4–R Act is an "asymmetrical statute." *CSX I, supra,* at 296. In subsections (b)(1) to (b)(3)—which specify prohibitions directed toward property taxes—the comparison class is limited to commercial and industrial property in the same assessment jurisdiction. But subsection (b)(4) contains no such limitation, so the comparison class is to be determined based on the theory of discrimination alleged in the claim. Thus, when a railroad alleges that a tax disadvantages it compared to its transportation industry competitors, its competitors in that jurisdiction are the comparison class. Because subsection (b)(4) requires a showing of *discrimination*, however, the comparison class must consist of individuals similarly situated to the claimant.

Subsection (b)(4) would be deprived of all real-world effect if "similarly situated" were given the same narrow construction the concept has in the Equal Protection Clause context, where it would be permissible for a State to tax a rail carrier more than a motor carrier, despite their seemingly similar lines of business. The category of "similarly situated" (b)(4) comparison classes must at least include the commercial and industrial taxpayers specified in the other subsections. But it also can include a railroad's competitors. Discrimination in favor of that class both falls within the ordinary meaning of "discrimination" and frustrates the 4–R Act's purpose of "restor[ing] the financial stability of the [Nation's] railway system" while "foster[ing] competition among all carriers by railroad and other modes of transportation," 90 Stat. 33. Contrary to Alabama's argument, normal rules of interpretation would say that the explicit limitation to "commercial and industrial" in the first three provisions, and its absence in the fourth, suggests that no such limitation applies to the fourth. Alabama's additional arguments are also unavailing. Pp. 4–8.

2. The Eleventh Circuit erred in refusing to consider whether Alabama could justify its decision to exempt motor carriers from its sales and use taxes through its decision to subject motor carriers to a fuel-excise tax. It does not accord with ordinary English usage to say that a tax discriminates against a rail carrier if a rival who is exempt from that tax must pay *another* comparable tax from which the rail carrier is exempt, since *both* competitors could then claim to be discriminated against relative to each other. The Court's negative Commerce Clause cases endorse the proposition that an additional tax on third parties may justify an otherwise discriminatory tax. *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 479–480. Similarly, an alternative, roughly equivalent tax is one possible justification that renders a tax disparity non-discriminatory. CSX's counterarguments

Syllabus

are rejected. On remand, the Eleventh Circuit is to consider whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption. Although the State cannot offer a similar defense with respect to its water carrier exemption, the court should also examine whether any of the State's alternative rationales justify that exemption. Pp. 8–10.

720 F. 3d 863, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–553

ALABAMA DEPARTMENT OF REVENUE, ET AL., PETITIONERS *v.* CSX TRANSPORTATION, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[March 4, 2015]

JUSTICE SCALIA delivered the opinion of the Court.

Federal law prohibits States from imposing taxes that "discriminat[e] against a rail carrier." 49 U. S. C. §11501(b)(4). We are asked to decide whether a State violates this prohibition by taxing diesel fuel purchases made by a rail carrier while exempting similar purchases made by its competitors; and if so, whether the violation is eliminated when other tax provisions offset the challenged treatment of railroads.

I

Alabama taxes businesses and individuals for the purchase or use of personal property. Ala. Code §§40–23–2(1), 40–23–61(a) (2011). Alabama law sets the general tax rate at 4% of the value of the property purchased or used. *Ibid.*

The State applies the tax, at the usual 4% rate, to railroads' purchase or use of diesel fuel for their rail operations. But it exempts from the tax purchases and uses of diesel fuel made by trucking transport companies (whom we will call motor carriers) and companies that transport goods interstate through navigable waters (water carri-

ers). Motor carriers instead pay a 19-cent-per-gallon fuel-excise tax on diesel; water carriers pay neither the sales nor fuel-excise tax on their diesel. §40–17–325(a)(2), and (b); §40–23–4(a)(10) (2014 Cum. Supp.). The parties stipulate that rail carriers, motor carriers, and water carriers compete.

Respondent CSX Transportation, a rail carrier operating in Alabama and other States, believes this asymmetrical tax treatment "discriminates against a rail carrier" in violation of the alliterative Railroad Revitalization and Regulation Reform Act of 1976, or 4–R Act. 49 U. S. C. §11501(b)(4). It sought to enjoin petitioners, the Alabama Department of Revenue and its Commissioner (Alabama or State), from collecting sales tax on its diesel fuel purchases.

At first, the District Court and Eleventh Circuit both rejected CSX's complaint. *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 350 Fed. Appx. 318 (2009). On this lawsuit's first trip here, we reversed. We rejected the State's argument that sales-and-use tax exemptions cannot "discriminate" within the meaning of subsection (b)(4), and remanded the case for further proceedings. *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, 562 U. S. 277, 296–297 (2011) (*CSX I*).

On remand, the District Court rejected CSX's claim after a trial. 892 F. Supp. 2d 1300 (ND Ala. 2012). The Eleventh Circuit reversed. 720 F. 3d 863 (2013). It held that, on CSX's challenge, CSX could establish discrimination by showing the State taxed rail carriers differently than their competitors—which, by stipulation, included motor carriers and water carriers. But it rejected Alabama's argument that the fuel-excise taxes offset the sales taxes—in other words, that because it imposed its fuel-excise tax on motor carriers, but not rail carriers, it was justified in imposing the sales tax on rail carriers, but not motor carriers. *Ibid*.

We granted certiorari to resolve whether the Eleventh Circuit properly regarded CSX's competitors as an appropriate comparison class for its subsection (b)(4) claim. 573 U. S. \_\_\_ (2014). We also directed the parties to address whether, when resolving a claim of unlawful tax discrimination, a court should consider aspects of a State's tax scheme apart from the challenged provision. *Ibid.*

## II

The 4–R Act provides:

"(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

"(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

"(2) Levy or collect a tax that may not be made under paragraph (1) of this subsection.

"(3) Levy or collect an ad valorem property tax at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

"(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part." §11501(b)(1)–(4).

In our last opinion in this case, we held that "discriminates" in subsection (b)(4) carries its ordinary meaning, and that a tax discriminates under subsection (b)(4) when

it treats "groups [that] are similarly situated" differently without sufficient "justification for the difference in treatment." *CSX I*, *supra*, at 287. Here, we address the meaning of these two quoted phrases.

### A

The first question in this case is who is the "comparison class" for purposes of a subsection (b)(4) claim. Alabama argues that the only appropriate comparison class for a subsection (b)(4) claim is all general commercial and industrial taxpayers. We disagree. While all general and commercial taxpayers is *an* appropriate comparison class, it is not the only one.

Nothing in the ordinary meaning of the word "discrimination" suggests that it occurs only when the victim is singled out relative to the population at large. If, for example, a State offers free college education to all returning combat veterans, but arbitrarily excepts those who served in the Marines, we would say that Marines have experienced discrimination. That would remain the case even though the Marines are treated the same way as members of the general public, who have to pay for their education.

Context confirms that the comparison class for subsection (b)(4) is not limited as Alabama suggests. The 4–R Act is an "asymmetrical statute." *Id.,* at 296. Subsections (b)(1) to (b)(3) contain three specific prohibitions directed towards property taxes. Each requires comparison of railroad property to commercial and industrial property in the same assessment jurisdiction. The Act therefore limits the comparison class for challenges under those provisions. Even if the jurisdiction treats railroads less favorably than residential property, no violation of these subsections has occurred. Subsection (b)(4) contains no such limitation, leaving the comparison class to be determined as it is normally determined with respect to discrimination

claims. And we think that depends on the theory of discrimination alleged in the claim. When a railroad alleges that a tax targets it for worse treatment than local businesses, all other commercial and industrial taxpayers are the comparison class. When a railroad alleges that a tax disadvantages it compared to its competitors in the transportation industry, the railroad's competitors in that jurisdiction are the comparison class.

So, picking a comparison class is extraordinarily easy. Unlike under subsections (b)(1)–(3), the railroad is not limited to all commercial and industrial taxpayers; all the world, or at least all the world within the taxing jurisdiction, is its comparison-class oyster. But that is not as generous a concession as might seem. What subsection (b)(4) requires, and subsections (b)(1)–(3) do not, is a showing of *discrimination*—of a failure to treat similarly situated persons alike. A comparison class will thus support a discrimination claim only if it consists of individuals similarly situated to the claimant.

That raises the question of when a proposed comparison class qualifies as similarly situated. In the Equal Protection Clause context, very few taxpayers are regarded as similarly situated and thus entitled to equal treatment. There, a State may tax different lines of businesses differently with near-impunity, even if they are apparently similar. We have upheld or approved of distinctions between utilities—including a railroad—and other corporations, *New York Rapid Transit Corp.* v. *City of New York*, 303 U. S. 573, 579 (1938), between wholesalers and retailers in goods, *Caskey Baking Co.* v. *Virginia*, 313 U. S. 117, 120–121 (1941), between chain retail stores and independent retail stores, *State Bd. of Tax Comm'rs of Ind.* v. *Jackson*, 283 U. S. 527, 535, 541–542 (1931), between anthracite coal mines and bituminous coal mines, *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245, 254, 257 (1922), and between sellers of coal oil and sellers of coal, *Southwestern*

*Oil Co.* v. *Texas*, 217 U. S. 114, 121 (1910). As one treatise has observed, we recognize a "wide latitude state legislatures enjoy in drawing tax classifications under the Equal Protection Clause." 1 J. Hellerstein & W. Hellerstein, State Taxation ¶3.03[1], p. 3–5 (3d ed. 2001–2005). This includes the power to impose "widely different taxes on various trades or professions." *Id.,* at 3–5 to 3–6. It would be permissible—as far as the Equal Protection Clause is concerned—for a State to tax a rail carrier more than a motor carrier, despite the seeming similarity in their lines of business.

The concept of "similarly situated" individuals cannot be so narrow here. That would deprive subsection (b)(4) of all real-world effect, providing protection that the Equal Protection Clause already provides. Moreover, the category of "similarly situated" (b)(4) comparison classes must include commercial and industrial taxpayers. There is no conceivable reason why the statute would forbid property taxes higher than what that class enjoys (or suffers), but permit other taxes that discriminate in favor of that class vis-à-vis railroads. And we think the competitors of railroads can be another "similarly situated" comparison class, since discrimination in favor of that class most obviously frustrates the purpose of the 4–R Act, which was to "restore the financial stability of the railway system of the United States," §101(a), 90 Stat. 33, while "foster[ing] competition among all carriers by railroad and other modes of transportation," §101(b)(2). We need not, and thus do not, express any opinion on what other comparison classes may qualify. Sufficient unto the day is the evil thereof.

Alabama claims that because subsections (b)(1) and (b)(3) (and (b)(2) through reference to (b)(1)) establish a comparison class of "commercial and industrial property," subsection (b)(4) must establish a comparison class of "general commercial and industrial taxpayers." This

inverts normal rules of interpretation, which would say that the explicit limitation to "commercial and industrial" in the first three provisions, and the absence of such a limitation in the fourth, suggests that no such limitation applies to the fourth. Moreover, Alabama's interpretation would require us to dragoon the modifier "commercial and industrial"—but not the noun "property"—from the first three provisions, append "general" in front of it and "taxpayers" after, both words foreign to the preceding subsections. We might also have to strip away the restrictions in the definition of "commercial and industrial property," which excludes land primarily used for agricultural purposes and timber growing. 49 U. S. C. §11501(a)(4). This is not our concept of fidelity to a statute's text.

Alabama responds that the introductory clause of §11501(b)—which declares that the "following acts unreasonably burden and discriminate against interstate commerce,"—"binds its four subsections together," Brief for Petitioners 23 (emphasis deleted), and gives them a common object and scope. The last time this case appeared before us, Alabama made a similar argument in support of the claim that, because subsections (b)(1)–(3) cover only property taxes, so too does subsection (b)(4). See Brief for Respondents in *CSX Transp., Inc.* v. *Alabama Dept. of Revenue*, O. T. 2010, No. 09–520, p. 25–26. We rejected this argument then, and we reject it again now.

Alabama persists that a case-specific inquiry allows a railroad to "hand-pick [its] comparison class," Brief for Petitioners 41, which would be unfair—a "windfall" to railroads. *Ibid.* As we have described above, picking a class is easy, but it is not easy to establish that the selected class is "similarly situated" for purposes of discrimination in taxation. The Eleventh Circuit properly concluded that, in light of CSX Transportation's complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appro-

priate, and differential treatment vis-à-vis that class would constitute discrimination. We therefore turn to the court's refusal to consider Alabama's alternative tax justifications.

B

A State's tax discriminates only where the State cannot sufficiently justify differences in treatment between similarly situated taxpayers. As we have discussed above, a rail carrier and its competitors can be considered similarly situated for purposes of this provision. But what about the claim that those competitors are subject to *other* taxes that the railroads avoid? We think Alabama can justify its decision to exempt motor carriers from its sales and use tax through its decision to subject motor carriers to a fuel-excise tax.

It does not accord with ordinary English usage to say that a tax discriminates against a rail carrier if a rival who is exempt from that tax must pay *another* comparable tax from which the rail carrier is exempt. If that were true, *both* competitors could claim to be disfavored—discriminated against—relative to each other. Our negative Commerce Clause cases endorse the proposition that an additional tax on third parties may justify an otherwise discriminatory tax. *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 479–480 (1932). We think that an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory.

CSX claims that because the statutory prohibition forbids "impos[ing] another tax that discriminates against a rail carrier," 49 U. S. C. §11501(b)(4)—"tax" in the singular—the appropriate inquiry is whether the challenged *tax* discriminates, not whether the tax code as a whole does so. It is undoubtedly correct that the "tax" (singular) must discriminate—but it does not discriminate unless it treats railroads differently from other *similarly situated* taxpay-

ers *without sufficient justification*. A comparable tax levied on a competitor may justify not extending that competitor's exemption from a general tax to a railroad. It is easy to display the error of CSX's single-tax-provision approach. Under that model, the following tax would violate the 4–R Act: "(1) All railroads shall pay a 4% sales tax. (2) All other individuals shall also pay a 4% sales tax."

CSX would undoubtedly object that not every case will be so easy, and that federal courts are ill qualified to explore the vagaries of state tax law. We are inclined to agree, but that cannot carry the day. Congress assigned this task to the courts by drafting an antidiscrimination command in such sweeping terms. There is simply no discrimination when there are roughly comparable taxes. If the task of determining when that is so is "Sisyphean," as the Eleventh Circuit called it, 720 F. 3d, at 871, it is a Sisyphean task that the statute imposes. We therefore cannot approve of the Eleventh Circuit's refusal to consider Alabama's tax-based justification, and remand for that court to consider whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption.

C

While the State argues that the existence of a fuel-excise tax justifies its decision to exempt motor carriers from the sales and use tax, it cannot offer a similar defense with respect to its exemption for water carriers. Water carriers pay neither tax.

The State, however, offers other justifications for the water carrier exemption—for example, that such an exemption is compelled by federal law. The Eleventh Circuit failed to examine these justifications, asserting that the water carriers were the beneficiaries of a discriminatory

tax regime.  We do not consider whether Alabama's alternative rationales justify its exemption, but leave that question for the Eleventh Circuit on remand.

\*    \*    \*

The judgment of the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 13–553

ALABAMA DEPARTMENT OF REVENUE, ET AL., PETITIONERS *v.* CSX TRANSPORTATION, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[March 4, 2015]

JUSTICE THOMAS, with whom JUSTICE GINSBURG joins, dissenting.

In order to violate 49 U. S. C. §11501(b)(4), "a tax exemption scheme must target or single out railroads by comparison to general commercial and industrial taxpayers." *CSX Transp., Inc.* v. *Alabama Dept. of Revenue* (*CSX I*), 562 U. S. 277, 297–298 (2011) (THOMAS, J., dissenting). Because CSX cannot prove facts that would satisfy that standard, I would reverse the judgment below and remand for the entry of judgment in favor of the Alabama Department of Revenue.

## I

### A

Last time this case was before the Court, I explained in detail my reasons for interpreting "another tax that discriminates against a rail carrier" in §11501(b)(4) to refer to a tax "that targets or singles out railroads as compared to other commercial and industrial taxpayers." *Id.,* at 298. I briefly summarize that reasoning here.

Because the meaning of "discriminates" is ambiguous at first glance, I look to the term's context to resolve this uncertainty. *Id.,* at 298–299. Both the structure and background of the statute indicate that subsection (b)(4) prohibits only taxes that single out railroads as compared

to other commercial and industrial taxpayers.

Subsection (b)(4) is a residual clause, the meaning of which is best understood by reference to the provisions that precede it. Subsection (b) begins by announcing that "[t]he following acts . . . discriminate against interstate commerce" and are prohibited. §11501(b). Subsections (b)(1) through (3) then list three tax-related actions that single out rail carriers by treating rail property differently from all other commercial and industrial property. §§11501(b)(1)–(3); *id.,* at 300. Subsections (b)(1) and (b)(3) explicitly identify "commercial and industrial property" as the comparison class, and subsection (b)(2) incorporates that comparison class by reference. §11501(b); *id.,* at 300. Subsection (b)(4) refers back to these provisions when it forbids "[i]mpos[ing] *another* tax that discriminates against a rail carrier." §11501(b)(4) (emphasis added); *id.,* at 300). The statutory structure therefore supports the conclusion that a tax "discriminates against a rail carrier" within the meaning of subsection (b)(4) if it singles out railroads for unfavorable treatment as compared to the general class of commercial and industrial taxpayers. *Id.*, at 300–301.

The statutory background supports the same conclusion. When Congress enacted the 4–R Act, it was apparent that railroads were "easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." *Id.,* at 301 (internal quotation marks omitted). Subsections (b)(1) through (3) thus "establish a political check" by preventing States from imposing excessive property taxes on railroads "without imposing the same taxes more generally on voting, resident local businesses." *Ibid.* Subsection (b)(4) is best understood as addressing the same problem in the same way. *Id.,* at 301–302.

B

Alabama's tax scheme cannot be said to "discriminat[e] against a rail carrier." *Id.,* at 302. To begin, the scheme does not single out rail carriers. Although one would not know it from the majority opinion, the tax is not directed at rail carriers, their property, their activity, or goods uniquely consumed by them. It is instead a generally applicable sales tax. It applies (with other exemptions not at issue here) to all goods purchased, used, or stored in the State of Alabama. Ala. Code §§40–23–2(1), 40–23–61(a) (2011). The only relevant good exempted from the tax is diesel on which the motor fuel tax has been paid, §40–17–325(b), and no provision of law prevents rail carriers from buying such diesel. See Brief for Respondent 46, n. 13 (acknowledging that CSX pays the motor fuel tax on the diesel fuel it uses in trucks and other on-road vehicles). Water carriers, it is true, enjoy a special carve-out from this sales tax, §40–23–4(a)(10) (Cum. Supp. 2014), but that exemption singles out *water* carriers, not *rail* carriers.

Even if this constellation of exemptions to Alabama's sales tax could be said to single out rail carriers from the general class of their interstate competitors, the tax surely does not single out rail carriers as compared to commercial and industrial taxpayers. Those taxpayers are subject to exactly the same generally applicable sales and use tax regime as are rail carriers.

II
A

The Court started off on the wrong track in *CSX I* when it relied on a generic dictionary definition of "discriminates" in the face of a statutory context suggesting a more specific definition. See 562 U. S., at 304. Today's decision continues that error.

The Court uncritically accepts the conclusion that the

"discriminat[ion]" addressed by the statute encompasses *any* distinction between rail carriers and their comparison class, *ante,* at 4, as opposed to mere "singling out" or something in between, even though the word "discriminates" is ambiguous in that way. *CSX I, supra,* at 299. The Court's usual practice has not been to treat the meaning of "discriminates" so casually. See generally *Guardians Assn.* v. *Civil Serv. Comm'n of New York City*, 463 U. S. 582, 590–593 (1983) (opinion of White, J.) (discussing the Court's shifting definition of the ambiguous term "discrimination").

Today's decision compounds this error by holding that a rail carrier may make out a claim of discrimination using any comparison class so long as that class consists of "individuals similarly situated to the claimant" rail carrier. *Ante,* at 5. The majority purports to derive this limitation from the dictionary, but then finds itself unable to proceed: After all, Black's Law Dictionary contains no entry defining what it means to be "similarly situated" for the purpose of subsection (b)(4). Forced finally to turn to the statutory context, the majority rejects the statutorily defined competitor class of commercial and industrial taxpayers in favor of a shifting comparison class of its own creation.

B

The majority disregards the commercial and industrial property comparison class identified in subsections (b)(1) through (3) because subsection (b)(4) does not explicitly include language from those provisions. See *ante,* at 4–5, 6–7. It asserts that defining the comparison class for the purpose of subsection (b)(4) by reference to the comparison class identified in subsections (b)(1) through (b)(3) "would require us to dragoon the modifier 'commercial and industrial'—but not the noun 'property'—from the first three provisions, append 'general' in front of it and 'taxpayers'

after, both words foreign to the preceding subsections." *Ante,* at 7.

The majority's accusation of grammatical conscription misses the point. Subsection (b)(4) is a residual clause, explicitly marked as such by the use of the word "another." See *Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 384 (2003). Like other residual clauses, it need not use the same language as the clauses it follows to derive meaning from those clauses. See, *e.g., Sossamon* v. *Texas*, 563 U. S. 277, ___ (2011) (slip op., at 13); *James* v. *United States*, 550 U. S. 192, 217–218 (2007) (SCALIA, J., dissenting). Where, as here, a residual clause includes an ambiguous word like "discriminates," we must look to the clauses that precede it to guide our understanding of its scope.

In some sense, my task in giving meaning to the statutory term "discriminates" is no different from the majority's: to determine what type of differential treatment the statute forbids. The first three clauses provide important clues that the statute forbids singling out rail carriers from other commercial and industrial taxpayers because commercial and industrial taxpayers are the ones who pay taxes on "commercial and industrial property." The majority pursues the same logical train of thought when it opines that "the category of 'similarly situated' (b)(4) comparison classes must include commercial and industrial taxpayers" because "[t]here is no conceivable reason why the statute would forbid property taxes higher than what that class enjoys (or suffers), but permit other taxes that discriminate in favor of that class vis-à-vis railroads." *Ante,* at 6. Where we part ways is in the inferences we draw from the statutory context.

Treating subsection (b)(4) as a residual clause does not require the grammatical distortions that the majority alleges. The word "discriminates" in subsection (b)(4) is not a referential phrase whose antecedent is uncertain. If

it were, then it would be necessary to select an antecedent that would fit grammatically in place of "discriminates." Instead, I look to (b)(1) to (3) merely to clarify an ambiguity in the *meaning* of "discriminates," a task that does not require me to "dragoon" the language of the prior clauses into subsection (b)(4).

Nor does my approach rely on the first three clauses of §11501(b) to supply a general limitation on the independent prohibition that appears in subsection (b)(4). See *United States* v. *Aguilar*, 515 U. S. 593, 615 (1995) (SCALIA, J., concurring in part and dissenting in part) (criticizing this type of argument). That is what Alabama sought to do in *CSX I* when it argued that subsection (b)(4) is limited to property taxes (or their equivalent "in lieu" taxes). *Ante,* at 7; *CSX I*, 562 U. S., at 285 (majority opinion). I joined the majority in rejecting that argument. *Id.,* at 297 (dissenting opinion). But whereas there is no uncertainty about the meaning of "taxes" in subsection (b)(4) that would justify importing the property tax limitation from the three preceding subsections, *id.,* at 284–285 (majority opinion), there is a good deal of uncertainty about the meaning of "discriminates." This uncertainty justifies looking to the three previous clauses to understand the type of differential treatment §11501(b) is meant to prohibit. *Id.,* at 298–299 (dissenting opinion); see *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 588–589 (1980). And those three previous clauses easily supply the answer to the comparison class question.

## C

Unwilling to so limit the range of available comparison classes, the majority takes an approach to determining which individuals are "similarly situated" for purposes of the statute that "is almost entirely ad hoc," *James*, *supra,* at 215 (SCALIA, J., dissenting). It asserts that the comparison class will "depen[d] on the theory of discrimination

alleged in the claim." *Ante*, at 4–5. Sometimes the comparison class will be "all other commercial and industrial taxpayers," sometimes it will be "the railroad's competitors" in a particular jurisdiction, and sometimes it may be some other comparison class entirely. *Id.,* at 5.

The sole evidence on which the majority relies to conclude that competitors are similarly situated, and therefore qualify as a comparison class, is the professed purposes of the Act: "to 'restore the financial stability of the railway system of the United States,' while 'foster[ing] competition among all carriers by railroad and other modes of transportation.'" *Ante,* at 6 (quoting 90 Stat. 33, §§101(a), (b)(2)). Interpreting statutory text solely in light of purpose, absent any reliance on text or structure, is dangerous business because it places courts in peril of substituting their policy judgment for that of Congress. In considering statutory purpose, therefore, we should be careful that any inferences of purpose are tied to text rather than instinct.

The majority throws such caution to the wind. Its two-sentence argument is a perfect illustration of the dangers of a purely purpose-based approach. The majority cherry-picks two of a number of stated goals of a complex piece of legislation over 100 pages long and assumes that this specific provision was assigned to those specific purposes. And then it interprets the statute to perform in the manner the majority believes is best designed to "restore . . . financial stability" and "foster . . . competition." *Ante,* at 6 (alteration omitted).

I have no reason to doubt the economic soundness of the majority's conclusion that discrimination between rail carriers and their competitors threatens their financial stability and impedes competition, but I lack the majority's certitude that §11501(b)(4) is designed to further *those goals* by combatting *that evil*, at least in *the way* the majority asserts. Instead, the first three subsections provide

strong textual evidence that §11501(b) was designed to stabilize rail carriers by protecting them from discrimination against interstate commerce. And they provide evidence of Congress' chosen mechanism for accomplishing that goal: tying the fate of interstate rail carriers to the broader class of commercial and industrial taxpayers. See *supra*, at 2.

The introductory clause of §11501(b) provides further evidence that the evil at which subsection (b)(4) is targeted is not discrimination between rail carriers and their competitors, but "acts [that] unreasonably burden and discriminate against interstate commerce." The majority's response to this evidence—that the Court rejected a similar argument when it refused to limit subsection (b)(4) to property taxes or their kin, *ante,* at 7—is a non sequitur. The introductory clause contains no reference to property taxes that "binds its four subsections together" as prohibitions on discriminatory property taxes. *Ibid.* (internal quotation marks omitted). But it *does* have a reference to discrimination against interstate commerce, which *does* tie the sections together to serve *that* common statutory purpose. This, in turn, weighs against the majority's inferences about how §11501(b) relates to the stated purposes of the 4–R Act.

The majority's conclusion that competitors are a permissible comparison class completely ignores these contextual clues, permitting subsection (b)(4) to serve different statutory goals by a different mechanism than its three predecessor clauses. And it leads to odd inconsistencies. If we were to understand the provision as prohibiting *only* discrimination between rail carriers and their competitors, then it might well further the goal of promoting competition between interstate carriers. But the majority instead selects a shifting-comparison-class approach, requiring rail carriers to be treated at least as well as their competitors and *any other* similarly situated taxpayers. See *ante,*

at 4–5. This most-favored taxpayer status is a position the competitors do not enjoy, so the majority's position could result in tax schemes that *impede* competition between interstate carriers rather than promote it.

Identifying "similarly situated" taxpayers by the undisciplined approach the majority endorses could well lead to other unanticipated consequences. This is why the policy judgments needed to link statutory mechanisms to statutory purposes are best left to Congress. If this Court is going to adopt a shifting-comparison-class approach to §11501(b)(4), then it should at least demand a stronger textual link between the comparison class a claimant seeks to import into subsection (b)(4) and any purpose that the claimant argues it serves.

## III

Because the majority adopts an interpretation of §11501(b)(4) that is not grounded in the text, it should come as no surprise that this interpretation is difficult to apply, as this case demonstrates. It is easy to see how, accepting water carriers as a comparison class, the scheme treats water carriers and rail carriers differently when it grants water carriers, but not rail carriers, an exemption from the sales tax. Ala. Code §40–23–4(a)(10). Identifying the difference in treatment between rail and motor carriers, by contrast, requires a good deal more imagination.

The majority's approach exhibits that imagination. It glosses over the general applicability of the provisions that apply to rail and motor carriers, stating that "[t]he State applies the [sales or use] tax, at the usual 4% rate, to railroads' purchase or use of diesel fuel for their rail operations," but "exempts from the tax purchases and uses of diesel fuel made by [motor carriers]." *Ante,* at 1. A quick glimpse at the code reveals that this is not quite the case. The applicability of the sales and use taxes does not depend on the identity of the purchaser, but on whether the

purchaser pays another excise tax, §40–17–325(b), which in turn depends on the nature of the product purchased and its use, §§40–17–328, 40–17–329, which in turn merely correlates to the carriers' operations.

As far as I can tell, the rail carriers use dyed diesel that is exempt from the motor fuel tax—and therefore subject to the sales and use taxes—as a matter of choice rather than necessity. Dyed diesel has no special properties that make it more suitable for use in a train engine; the dye merely identifies it as exempt from the federal excise tax, §40–17–322(21). And no law prohibits rail carriers from using undyed diesel. To the contrary, it is the motor carriers who are prohibited from using the dyed variant for on-road use.

Assuming *arguendo* that state law provides that only dyed diesel may be used in rail operations, it becomes a little easier to make an argument that the State treats rail carriers differently *in this case*. But the majority still faces a line-drawing problem. Is it necessary that the good subject to the challenged tax be the same as the good on which the competitor enjoys an exemption? Could a rail carrier that relies on natural gas rather than diesel for motive power make the same claim of discrimination if natural gas is not entitled to the same sales-tax exemption as diesel? Is it necessary that the rail carrier and its competitor rely on the good for the same purpose? Could a rail carrier that uses diesel for motive power challenge a hypothetical provision that exempted from the sales and use taxes diesel that motor carriers use for refrigeration in refrigerated trailers?

The majority never answers these questions. "Sufficient unto the day is the evil thereof," it intones. *Ante,* at 6. "That gets this case off our docket, sure enough. But it utterly fails to do what this Court is supposed to do: provide guidance concrete enough to ensure that the" statute is applied consistently. *James*, 550 U. S., at 215 (SCALIA,

J., dissenting). We have demanded clarity from Congress when it comes to statutes that "se[t] limits upon the taxation authority of state government, an authority we have recognized as central to state sovereignty." *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 344–345 (1994). We should demand the same of ourselves when we interpret those statutes. Yet after today's decision, lower courts, soon to be met with an oyster's shellful of comparison classes, *ante,* at 5, will have no idea how to determine when a tax exemption that is not tied to the taxpayer's status constitutes differential treatment of two taxpayers.

\*    \*    \*

The majority's interpretation of §11501(b)(1) derails ambiguous text from clarifying context. The result it reaches is predictably unworkable. And it prolongs Alabama's burden of litigating a baseless claim of discrimination that should have been dismissed long ago. I respectfully dissent.