[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11705
_____

D.C. Docket No. 2:08-cv-00655-AKK

CSX TRANSPORTATION, INC.,

Plaintiff-Appellant,

versus

ALABAMA DEPARTMENT OF REVENUE,
COMMISSIONER OF THE ALABAMA DEPARTMENT OF REVENUE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 25, 2018)

ON PETITION FOR REHEARING

Before ED CARNES, Chief Judge, BLACK, Circuit Judge, and MAY,[*] District Judge.

ED CARNES, Chief Judge:

We grant the State of Alabama's petition for rehearing in the nature of a request for clarification and extension of opinion and issue this opinion with modest revisions as a substitute for the one we issued initially.  See CSX Transp., Inc. v. Ala. Dep't of Revenue, 886 F.3d 974 (11th Cir. 2018).

The Railroad Revitalization and Regulatory Reform Act prohibits states from imposing a tax "that discriminates against a rail carrier."  49 U.S.C. § 11501(b)(4).  The question before us is whether Alabama's tax scheme, which imposes either a sales or use tax on rail carriers when they buy or consume diesel fuel but exempts competing motor and water carriers from those taxes, violates the Act.  Our answer is "no" as to motor carriers, "yes" as to water carriers.

## I.  BACKGROUND

### A.  Facts

CSX Transportation, Inc. is an interstate rail carrier that does business and pays taxes in a number of states including Alabama.  In the shipment of freight interstate it and other rail carriers compete against trucking transport companies (motor carriers) and commercial ships, vessels, and barges (water carriers).  Yet

_____

[*] Honorable Leigh Martin May, United States District Judge for the Northern District of Georgia, sitting by designation.

2

Alabama taxes each type of carrier differently on the purchase or use of diesel fuel inside the state. Rail carriers pay a 4% sales and use tax on diesel fuel,[1] while motor carriers and water carriers are exempt from that tax, see Ala. Code §§ 40-17-325(b) (motor carriers), 40-23-4(a)(10) (water carriers). Motor carriers do pay a Motor Fuels Excise Tax of $0.19 per gallon of diesel.[2] Id. § 40-17-325(a). But water carriers pay no tax of any kind to Alabama for diesel fuel they purchase or use in Alabama to transport freight interstate. Id. §§ 40-23-4(a)(10) (sales tax exemption), 40-23-62(12) (use tax exemption).

The State deposits revenue from the sales and use tax that rail carriers pay into the general fund and earmarks it for education purposes. Id. § 40-23-35(f). Of the $0.19 per gallon excise tax that motor carriers pay, $0.13 goes to the Alabama Department of Transportation for the construction and maintenance of roads and bridges and for the payment of highway bonds. Id. § 40-17-361(a). The remaining

---

[1] The "sales and use tax" is actually two separate taxes on tangible personal property (including diesel fuel): a 4% sales tax on it if purchased in Alabama, and a 4% use tax on it if purchased outside Alabama but used inside the state. Ala. Code §§ 40-23-2(1) (sales tax), 40-23-61(a) (use tax). The rate is the same regardless of which of the two taxes is applied and it is stylistically simpler to refer to the taxes as though they were one. For those reasons, we will use the term "the sales and use tax" to refer to either or both taxes (unless we are quoting part of a district court or Supreme Court opinion that refers to them separately).

[2] For the first half of this litigation, the Motor Fuels Excise Tax was codified at Alabama Code § 40-17-2. The State modified its motor fuels tax scheme in October 2012, and the excise tax is now codified at § 40-17-325(a)(2), (b). The modification did not alter the amount of the tax, only the time at which it is imposed, a change that does not affect the outcome of this case.

$0.06 per gallon goes to counties, towns, and cities for the construction and maintenance of roads and bridges.  Id. § 40-17-361(b).

In 2008 CSX sued the Alabama Department of Revenue, seeking to enjoin the Department from collecting the sales and use tax on the railroad's purchase or consumption of diesel fuel in the state.  It also sought a declaratory judgment that the imposition of that tax violates the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. § 11501, often called "the 4-R Act."

Congress enacted the 4-R Act to "restore the financial stability of the railway system of the United States" and to "foster competition among all carriers by railroad and other modes of transportation."  45 U.S.C. § 801(a), (b)(2).  The 4-R Act forbids states from discriminating against rail carriers in assessing property or imposing taxes.  49 U.S.C. § 11501(b).  It specifies that states and their subdivisions may not:

(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4)  Impose another tax that discriminates against a rail carrier.

Id.  The first three paragraphs address property taxes, not sales and use taxes, and are not at issue here.  The fourth paragraph is a catchall that applies to taxes generally and provides the basis for CSX's claim about the sales and use tax imposed on it but not on the other types of carriers.

## B.  Procedural History

Over the past decade, this case has made two trips to the Supreme Court, stopping along the way three times at the district court and five times here. Because it is all pretty much relevant, we will set out that procedural history in some detail.

In doing so, we will begin with a discussion of the first district court order, which dismissed CSX's complaint, and from there we will recount our decision on appeal and the Supreme Court's first decision.  We will then discuss the district court's second opinion, our second decision on appeal, and the Supreme Court's second decision.  Finally, we will discuss the third leg of the journey to date, starting with our second remand order and ending with the district court judgment from which CSX now appeals.

### 1.  First Round of Proceedings

In round one of this case, the district court dismissed CSX's complaint and we affirmed.  CSX Transp., Inc. v. Ala. Dep't of Revenue, 350 F. App'x 318 (11th

5

Cir. 2009), rev'd, 562 U.S. 277, 131 S. Ct. 1101 (2011), vacated, 639 F.3d 1040 (11th Cir. 2011).  In doing so, we relied on one of our earlier decisions involving a nearly identical challenge to Alabama's tax scheme.  See Norfolk S. Ry. v. Ala. Dep't of Revenue, 550 F.3d 1306 (11th Cir. 2008), abrogated by 562 U.S. 277, 131 S. Ct. 1101.  Based on Norfolk we held that discrimination in the granting of tax exemptions does not amount to tax discrimination for purposes of the 4-R Act.  See 350 F. App'x at 319.

The Supreme Court reversed our decision and held that denying rail carriers exemptions provided to other carriers can be a form of discrimination under the 4-R Act.  CSX Transp., Inc. v. Ala. Dep't of Revenue ("CSX I"), 562 U.S. 277, 280, 131 S. Ct. 1101, 1105 (2011).  The Court explained that a tax discriminates when it treats "groups [that] are similarly situated" differently without "justification for the difference in treatment."  Id. at 287, 131 S. Ct. at 1109.  As a result, "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4) as a 'tax that discriminates against a rail carrier.'"  Id. at 288, 131 S. Ct. at 1109.  The Court did not decide whether the different tax treatment violated the 4-R Act, but it did decide that the outcome "depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers."  Id. at n.8, 131 S. Ct. at 1109 n.8.

6

## 2.  Second Round of Proceedings

On remand, after holding a bench trial the district court ruled that Alabama's sales and use tax scheme does not discriminate against CSX.  CSX Transp., Inc. v. Ala. Dep't of Revenue, 892 F. Supp. 2d 1300 (N.D. Ala. 2012), rev'd and remanded, 720 F.3d 863 (11th Cir. 2013), rev'd and remanded, 575 U.S. __, 135 S. Ct. 1136 (2015), vacated and remanded, 797 F.3d 1293 (11th Cir. 2015).  The district court concluded that the motor carrier exemption to the sales and use tax is justified because motor carriers pay a "substantially similar" amount under the excise tax that applies to them.  Id. at 1313.  As to water carriers, which pay neither tax when they purchase or use diesel fuel to haul freight interstate, the district court concluded that international commerce clause concerns do provide a rational basis for exempting them and also that CSX had failed to show that it had suffered a discriminatory effect.  Id. at 1316–17.

We reversed.  CSX Transp., Inc. v. Ala. Dep't of Revenue, 720 F.3d 863, 865 (11th Cir. 2013), rev'd and remanded, 575 U.S.__. 135 S. Ct. 1136 (2015), vacated and remanded, 797 F.3d 1293 (11th Cir. 2015).  We first decided whether to apply the "functional approach" or the "competitive approach" to identify a comparison class of taxpayers for 4-R Act claims.  Id. at 867–69.  The functional approach compares rail carriers to all other "commercial and industrial" taxpayers, thereby importing into § 11501(b)(4) the "commercial and industrial" limitation

from the three preceding paragraphs.  Id. at 867 (citing Kansas City S. Ry. v. Koeller, 653 F.3d 496, 508 (7th Cir. 2011)).  The competitive approach, by contrast, compares rail carriers only to their competitors.  Id. at 867–68.

We chose the competitive approach, reasoning that the functional approach disadvantages rail carriers by applying too broad a comparison class and that the competitive approach better accords with the 4-R Act's purpose.  Id. at 869.  Applying the competitive approach, we held that motor carriers and water carriers are competitors of, and as a result proper comparators to, rail carriers.  Id. at 867.  Because those two competitors are exempt from the sales and use tax, we reasoned that CSX had established a "prima facie case of discrimination," shifting the burden to the State to justify its facially discriminatory tax.  Id. at 869.

We rejected the argument that the motor carrier exemption to the sales and use tax would be justified if motor carriers paid excise taxes in amounts substantially similar to the sales and use tax that the rail carriers paid.  Id.  We held, instead, that a court should look "only at the sales and use tax with respect to fuel to see if discrimination has occurred."  Id. (quotation marks omitted).  We reasoned that focusing solely on the specific tax that is allegedly discriminatory would avoid the "Sisyphean burden of evaluating the fairness of the State's overall tax structure in order to determine whether a single tax exemption causes a state's sales tax to be discriminatory."  Id. at 871.  Because the State failed to justify the

motor carrier exemption, and because "no one can seriously dispute that the water carriers, who pay not a cent of tax on diesel fuel, are the beneficiaries of a discriminatory tax regime," we reversed and remanded with instructions to enter declaratory and injunctive relief for CSX. Id.

The Supreme Court granted certiorari on two questions: "whether the Eleventh Circuit properly regarded CSX's competitors as an appropriate comparison class for its subsection (b)(4) claim," and "whether, when resolving a claim of unlawful tax discrimination, a court should consider aspects of a State's tax scheme apart from the challenged provision." Ala. Dep't of Revenue v. CSX Transp., Inc. ("CSX II"), 575 U.S. __, 135 S. Ct. 1136, 1140 (2015).

On the first question, the Court agreed with us that, "in light of [CSX's] complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appropriate, and differential treatment vis-à-vis that class would constitute discrimination." Id. at 1143. The Court rejected Alabama's argument that the proper comparison class is all commercial and industrial taxpayers, deciding that the "commercial and industrial" limitation from 49 U.S.C. § 11501(b)(1)–(3) does not carry over to (b)(4). Id. at 1142–43. Given the 4-R Act's purpose of "restor[ing] the financial stability of the railway system" while "foster[ing] competition among all carriers by railroad and other modes of

transportation," the Court held that competitors "can be another 'similarly situated' comparison class." Id. at 1142 (quoting 45 U.S.C. § 801(a), (b)(2)).

On the second question, about whether a state's other taxes should be considered in the analysis, the Court held that "an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory." Id. at 1143. The Court reasoned that "[i]t does not accord with ordinary English usage to say that a tax discriminates against a rail carrier if a rival who is exempt from that tax must pay another comparable tax from which the rail carrier is exempt." Id. As a result, the Court held that this Court should have let the State "justify its decision to exempt motor carriers from its sales and use tax through its decision to subject motor carriers to a fuel-excise tax" (which the rail carriers do not pay). Id.

The Court remanded for us to consider "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales [and use] tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption." Id. at 1144. It did not specify a standard for determining whether those taxes are "roughly equivalent." See id. As to water carriers, which pay no state tax when they purchase or use diesel fuel to transport freight interstate, the Court noted that "[t]he State . . . offer[ed] other justifications for the water carrier exemption — for example, that such an exemption is compelled by federal law," and directed us to consider those "alternative rationales" on remand. Id.

10

### 3. Third Round of Proceedings

We vacated the district court's judgment and remanded for proceedings "consistent with the Supreme Court's opinion." CSX Transp., Inc. v. Ala. Dep't of Revenue, 797 F.3d 1293, 1294 (11th Cir. 2015). On remand, the district court again ruled that Alabama's tax scheme does not violate the 4-R Act. CSX Transp., Inc. v. Ala. Dep't of Revenue, 247 F. Supp. 3d 1240, 1242–43 (N.D. Ala. 2017).

The district court concluded that the motor carrier exemption does not violate the 4-R Act for two reasons. First, the court found that CSX's trains can operate on either clear diesel or dyed diesel, and that if CSX opted to purchase clear diesel, it would be subject to the excise tax, just like motor carriers, instead of the sales and use tax.[3] Id. at 1245. For that reason, the court ruled that any alleged discrimination is "self-imposed," and as a result, "the State has established that its tax schemes for dyed diesel and clear diesel do not discriminate against rail carriers." Id. at 1247. Alternatively, the court ruled that the motor carrier exemption is justified because the excise tax that motor carriers pay is "roughly equivalent" to the sales and use tax. Id.

---

[3] Under federal law, tax-exempt fuel must be "indelibly dyed." 26 U.S.C. § 4082(a)(2). Federal law prohibits using dyed diesel for travel on highways. Id. § 4041(a)(1)(A). Trains can run on clear diesel, but CSX and its peer rail carriers buy dyed diesel to avoid paying federal and state motor fuels taxes at the pump. If as the State suggests CSX were to switch between clear and dyed diesel depending on tax implications, CSX says it would incur operational disruptions and costs, including "a $9 million per year increase in up-front fuel costs due to the time lag necessary to secure federal highway tax refunds, and the costs to put in a specialized system to track fuel usage to secure those refunds." Appellant's Br. at 15.

11

The court also determined that there were two reasons why the water carrier exemption does not violate the 4-R Act. First, it concluded that the exemption "does not violate the 4-R Act" because "CSX has suffered no competitive injury" from that exemption. Id. at 1255. Second, it found that because "imposition of a state sales [and use] tax on interstate water carriers would expose the State to liability under the negative Commerce Clause," their exemption "is compelled by federal law." Id. at 1252 (citing CSX II, 135 S. Ct. at 1144). This is CSX's appeal.

## II. STANDARD OF REVIEW

We review de novo the district court's interpretation of the Supreme Court's rulings and the scope of the mandate. Cox. Enters., Inc. v. News-Journal Corp., 794 F.3d 1259, 1271–72 (11th Cir. 2015). We also review de novo questions of statutory interpretation. Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., 51 F.3d 235, 237 (11th Cir. 1995). The district court's factual findings we review only for clear error. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005).

## III. STANDING

The State contends that CSX lacks standing. It raises that issue for the first time in this appeal, but because standing goes to Article III jurisdiction a party can contest it "at any point in the litigation." Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist., 647 F.3d 1296, 1302 (11th Cir. 2011). To have standing, CSX "must

12

have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. __, 136 S. Ct. 1540, 1547 (2016).

CSX meets those three requirements. Without a favorable decision it will suffer an injury in fact because it will continue to be liable for roughly $5 million per year in sales and use tax on diesel fuel. See Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 599, 127 S. Ct. 2553, 2653 (2007) ("[B]eing forced to pay . . . a tax causes a real and immediate economic injury to the individual taxpayer."). CSX's claimed injury is fairly traceable to the Department, which the parties stipulate is responsible for "administer[ing] and collect[ing] taxes within Alabama, including the administration of sales and use taxes." And that injury would be redressed by a declaratory judgment that the sales and use tax violates the 4-R Act and an injunction prohibiting the Department from collecting that tax on CSX's purchase and consumption of diesel.

The State does not, of course, contest that CSX has paid, and unless it prevails here will continue to be liable for paying, the sales and use tax. It argues instead that CSX has not suffered an injury in fact because it failed to prove "that Alabama's exemption for water carriers actually injures CSX." But CSX's challenge seeks to prevent application of the sales and use tax on it, not an end to

13

the exemption of the water carriers from the tax. CSX I, 562 U.S. at 286, 131 S. Ct. at 1108 ("What the complaint protests is Alabama's imposition of taxes on the fuel CSX uses; what the complaint requests is that Alabama cease to collect those taxes from CSX. . . . The exemptions, no doubt, play a central role in CSX's argument . . . . But the essential subject of the complaint remains the taxes Alabama levies on CSX.") (citations omitted). The only injury CSX must prove for standing purposes is liability for the sales and use tax that it claims is discriminatory in violation of the 4-R Act. CSX has standing.

## IV. THE MOTOR CARRIER EXEMPTION

The Supreme Court remanded this case for us to consider "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales [and use] tax as applied to diesel fuel, and therefore justifies the motor carrier sales [and use] tax exemption." CSX II, 135 S. Ct. at 1144. We in turn remanded it to the district court for proceedings "consistent with the Supreme Court's opinion." CSX Transp., 797 F.3d at 1294. The district court in turn decided that the motor carrier exemption does not violate the 4-R Act for two reasons: (1) CSX's trains can operate on either clear or dyed diesel, so any alleged discrimination is "self-imposed," and (2) the excise tax is "roughly equivalent" to the sales and use tax. CSX Transp., 247 F. Supp. 3d at 1247, 1255. We address each ruling in turn.

14

A.  The District Court's Clear Fuel Ruling

The district court found that CSX's trains can operate on clear diesel and that if CSX chose to do so, it could avoid the sales and use tax and instead pay the excise tax, just like motor carriers, which would be perfectly nondiscriminatory. Id.  For that reason, the court ruled that any alleged discrimination is "self-imposed," and "the State has established that its tax schemes for dyed diesel and clear diesel do not discriminate against rail carriers." Id. at 1247.  That ruling violates the mandate rule.

"The mandate rule is a specific application of the 'law of the case' doctrine which provides that subsequent courts are bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case." Friedman v. Mkt. St. Mortg. Corp., 520 F.3d 1289, 1294 (11th Cir. 2008) (quotation marks omitted).  That rule "has its greatest force when a case is on remand to the district court." Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 881 F.3d 835, 843 (11th Cir. 2018).  A district court "must implement both the letter and the spirit of the mandate taking into account the appellate court's opinion and the circumstances it embraces." Cox Enters., 794 F.3d at 1271 (quotation marks and alterations omitted).  Although a district court is "free to address, as a matter of first impression, those issues not disposed of on appeal," it is "bound to follow the appellate court's holdings, both expressed and implied." Id. (quotation marks

15

omitted). The scope of the mandate is informed by the scope of the issues considered in the earlier appeal. Id.

The scope of the mandate that came out of our last decision was narrow. As to motor carriers, the Supreme Court had instructed us to consider only "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales [and use] tax as applied to diesel fuel, and therefore justifies the motor carrier sales [and use] tax exemption." CSX II, 135 S. Ct. at 1144. The district court noted that instruction and acknowledged that the clear fuel argument is not a "justification," but ruled that it could be a basis for defeating CSX's claim anyway. 247 F. Supp. 3d at 1244 ("[T]he State introduced evidence not only to show sufficient justification, but also to prove: that any 'discrimination' is self-imposed through rail carriers' practice of purchasing dyed, rather than clear, fuel . . . .") (emphasis added).

That ruling went beyond the scope of the mandate, which was limited to whether the excise tax and the sales and use tax are roughly equivalent. CSX II, 135 S. Ct. at 1144. But because we agree with the district court's alternative ruling that the excise tax is roughly equivalent to the sales and use tax and, as a result, it justifies the motor carrier exemption, CSX Transp., 247 F. Supp. 3d at 1247–48, any error in the district court's clear fuel ruling is harmless.

16

## B.  The District Court's "Roughly Equivalent" Ruling

The district court decided that the motor carrier exemption is justified because the sales and use tax is "roughly equivalent" to the excise tax.  Id.  The Supreme Court did not specify how to decide whether those two taxes are roughly equivalent.  See CSX II, 135 S. Ct. at 1144.  So we have to decide the proper test for determining whether those taxes are roughly equivalent before we can evaluate if the district court was correct in deciding that they are.

The district court interpreted "roughly equivalent" to carry its ordinary meaning and limited its inquiry to whether the "fuel-excise tax approximates the sales [and use] tax."  CSX Transp., 247 F. Supp. 3d at 1247.  Applying that standard, the court found that over a recent nine-year period, the average rates rail carriers and motor carriers paid on diesel fuel differed "by some quantity between less-than-half-of-one cent and 3.5 cents" per gallon.[4]  Id. at 1250–51.  That led the court to conclude that "the fuel-excise tax motor carriers pay is 'roughly equivalent' to the sales [and use] tax CSX pays."  Id. at 1251.  In reaching that conclusion the court declined to consider how the State spends revenues from those different taxes.  Id. at 1251 n.16.

---

[4] The difference fluctuates because the excise tax that motor carriers pay is assessed as a flat rate per gallon of fuel consumed regardless of the price of the fuel, while the sales and use tax that rail carriers pay is assessed ad valorem and depends on the price of fuel.  Compare Ala. Code § 40-17-325(a)(2) (excise tax), with Ala. Code §§ 40-23-2(1) (sales tax), 40-23-61(a) (use tax).

17

CSX doesn't question the district court's math.  Instead, it questions the test that the district court applied.  CSX argues that the proper test is the compensatory tax doctrine — a three-part dormant Commerce Clause test that would require us to compare not only the rate that rail carriers and motor carriers pay under the sales and use tax and the excise tax, but also how the State allocates revenue from those taxes.  Appellant's Br. at 38–39 (citing West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201, 114 S. Ct. 2205, 2215 (1994) (examining revenue expenditures to determine whether a facially discriminatory tax violates the dormant Commerce Clause)).

The crux of CSX's argument is that the excise tax is not roughly equivalent to the sales and use tax because the excise tax "is used exclusively to fund public highways," effectively subsidizing the infrastructure on which motor carriers travel, while "the railroad sales [and use] tax is deposited in the State's general fund, earmarked primarily for education."  Compare Ala. Code § 40-17-361(a), (b), with id. § 40-23-35(f).  Because excise tax revenues directly benefit motor carriers while sales and use tax revenues do not directly benefit rail carriers, CSX asserts that the excise tax "cannot possibly be 'roughly equivalent'" to the sales and use tax.

CSX does not pretend that the 4-R Act's text supports its contention that a state's revenue expenditures control a claim under that statute.  It argues instead

18

that the Supreme Court in its decision implicitly guided us toward the compensatory tax doctrine and examining revenue expenditures in two ways. The first was by using the phrase "roughly equivalent," some variation of which appears in all compensatory tax doctrine cases, and the second was by citing the "foundational" compensatory tax doctrine case of Gregg Dyeing Co. v. Query, 286 U.S. 472, 52 S. Ct. 631 (1932).

### 1. The 4-R Act Is Concerned with the Imposition of Taxes, Not with the Expenditure of Revenue from Taxes

"We begin, as in any case of statutory interpretation, with the language of the statute." CSX I, 562 U.S. at 283, 131 S. Ct. at 1107. And the plain language of § 11501(b)(4) stops in its tracks CSX's argument that we must consider how the State allocates revenue raised by the taxes in question.

Section 11501(b)(4) provides that no state shall "[i]mpose another tax that discriminates against a rail carrier." The syntax of the sentence makes clear that the source of discrimination must be the state's imposition of a tax. The relative pronoun "that" introduces the subordinate clause "that discriminates against a rail carrier." The subordinate clause modifies the antecedent "tax" and describes the kinds of taxes states may not impose. All of which is a fancy way of saying that § 11501(b)(4) doesn't prohibit all anti-railroad discrimination, but only that which occurs in the state's imposition of a tax. Which is, after all, what the provision says.

19

In spite of that, CSX would have us read that provision to require revenue from the sales and use tax paid by rail carriers to benefit them as much as revenue from the excise tax paid by motor carriers benefits those carriers.  That reading of § 11501(b)(4) does not fit the meaning of "impose."  Impose, Black's Law Dictionary (10th ed. 2014) ("To levy or exact (a tax or duty).").  States cannot "levy or exact" a revenue expenditure.  CSX's proposed reading of §11501(b)(4) also equates "tax" with revenue, even though "tax" by definition distinguishes the "charge . . . imposed by the government" from the "revenue" it seeks to yield.  Tax, Black's Law Dictionary (10th ed. 2014).  Stripped to the rails, CSX's argument depends on calling revenues taxes.  And "an argument that depends on calling a duck a donkey is not much of an argument."  Gilbert v. United States, 640 F.3d 1293, 1320 (11th Cir. 2011).

CSX's interpretative remodeling of § 11501(b)(4)'s restriction on states would require us to rewrite the "[i]mpose another tax that discriminates against a rail carrier" language in one of two ways.  The first way would be to add words to the provision so that no state could:

> Impose another tax or appropriate revenue in a way that discriminates against a rail carrier.

Or subtract some language and add other language so that no state could:

> Impose another tax that discriminate[ ] against a rail carrier in any other way.

20

"But we are not allowed to add or subtract words from a statute." Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1224 (11th Cir. 2009); accord T-Mobile South, LLC v. City of Milton, 728 F.3d 1274, 1284 (11th Cir. 2013) ("Although we, like most judges, have enough ego to believe that we could improve a good many statutes if given the chance, statutory construction does not give us that chance if we are true to the judicial function."); Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1286 (11th Cir. 2011) ("[W]e are not licensed to practice statutory remodeling."). If Congress had intended for § 11501(b)(4) to cover a state's revenue expenditures, it easily could have written it to say so. It didn't. And we assume that "Congress does not generally 'hide elephants in mouseholes.'" Rambaran v. Sec'y, Dep't of Corr., 821 F.3d 1325, 1333 (11th Cir. 2016) (quoting Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468, 121 S. Ct. 903, 909–10 (2001)).

Reading § 11501(b)(4) in context adds another layer of conviction to our conclusion. See Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267 (11th Cir. 2007) (explaining that in statutory interpretation, "context is king"); accord Dolan v. U.S. Postal Serv., 546 U.S. 481, 486, 126 S. Ct. 1252, 1257 (2006) (The proper "[i]nterpretation of a word or phrase depends upon reading the whole statutory text . . . ."). The three paragraphs preceding the more general § 11501(b)(4) prohibit discrimination against rail carriers in the assessment of, or

21

rates applicable to, property for purposes of taxation. 49 U.S.C. § 11501(b)(1)–(3).[5] They say nothing about revenue allocation or spending that discriminates against rail carriers. Because none of the four paragraphs comprising § 11501(b) mention revenue, it is evident that Congress did not intend (assuming it had any collective intent) for us to consider revenue expenditures in deciding whether a tax discriminates for purposes of subsection (b)(4).

For all of those reasons, we hold that how the State allocates its tax revenues is irrelevant to whether it "[i]mposes [a] tax that discriminates against a rail carrier." Id. § 11501(b)(4).

2. The Supreme Court Did Not Tell Us to Apply the Compensatory Tax Doctrine

Undeterred by the plain text or by context, CSX contends that in deciding whether there is discrimination in violation of § 11501(b)(4) we must give weight to discriminatory revenue expenditures because the Supreme Court in CSX II told us to apply the compensatory tax doctrine. But the Court didn't tell us to do that. In fact, its opinion does not once use "compensatory" or any other derivative of the word "compensate." The Court has told us that it usually (almost always, we hope) says what it means and means what it says: "[A] good rule of thumb for

---

[5] In the order in which they appear, those paragraphs forbid states or their subdivisons from assessing rail transportation property at a higher ratio to true market value than other commercial and industrial property, id. § 11501(b)(1); from levying property taxes based on such an assessment, id. § 11501(b)(2); and from levying ad valorem taxes on rail transportation property at a higher rate than for commercial and industrial property generally, id. § 11501(b)(3).

reading our decisions is that what they say and what they mean are one and the same." Mathis v. United States, 579 U.S. __, 136 S. Ct. 2243, 2254 (2016). Another good rule of thumb is that when the Supreme Court means to require something on remand, the Court will say that it is required. The Court did not say that we were to use the compensatory tax doctrine to determine if a tax scheme violates § 11501(b)(4).

Not to be derailed by the Supreme Court's failure to mention the compensatory tax doctrine, CSX argues that we still must apply that doctrine because the Court did use the term "rough equivalent," some variation of which appears in all compensatory tax doctrine cases.[6] CSX's argument is a fine example of a terminal logical fallacy known to logicians as an "illicit conversion" and to LSAT students as a "mistaken reversal." See, e.g., Patrick J. Hurley and Lori Watson, A Concise Introduction to Logic 230–31 (13th ed. 2016); Steve Schwartz, Conditional Reasoning: Contrapositive, Mistaken Reversal, Mistaken Negation, LSAT Blog, April 10, 2009, http://lsatblog.blogspot.com/2009/04/conditional-reasoning-contrapositive.html. That all compensatory tax doctrine decisions

---

[6] Some of CSX's cited decisions feature a variation of "rough equivalent" or "rough approximate." See, e.g., S. Cent. Bell Tel. Co. v. Alabama, 526 U.S. 160, 169, 119 S. Ct. 1180, 1186 (1999) (compensatory tax burden must "roughly approximate" the allegedly discriminatory tax burden) (alterations omitted); Fulton Corp. v. Faulkner, 516 U.S. 325, 332–33, 116 S. Ct. 848, 854 (1996) (The compensatory tax "must be shown roughly to approximate — but not exceed the amount of the tax on intrastate commerce."); Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 103, 114 S. Ct. 1345, 1352 (1994) (noting that a compensatory tax is the "rough equivalent" of a "substantially similar" discriminatory tax).

feature the words "rough equivalent" does not mean that all decisions featuring those words are compensatory tax doctrine cases.  Just as the fact that all birds are animals does not mean that all animals are birds.

As it happens, the Supreme Court has used the phrase "rough equivalent" in all sorts of contexts.  It has used the term when talking about taxes in the due process and Commerce Clause contexts (to which the compensatory tax doctrine does not apply).  See Moorman Mfg. Co. v. Bair, 437 U.S. 267, 280, 98 S. Ct. 2340, 2348 (1978) ("In this case appellant's actual income tax obligation was the rough equivalent of a 1% tax on the entire gross receipts from its Iowa sales.") (emphasis added).  It has used the phrase when talking about extortion.  See Ocasio v. United States, 578 U.S. __, 136 S. Ct. 1423, 1428 (2016) ("[T]he type of extortion for which petitioner was convicted — obtaining property from another with his consent and under color of official right — is the rough equivalent of what we would now describe as 'taking a bribe.'") (emphasis added).  It has even used the phrase when talking about usufructs of all things.  See Boggs v. Boggs, 520 U.S. 833, 836, 117 S. Ct. 1754, 1758 (1997) ("A lifetime usufruct is the rough equivalent of a common-law life estate.") (emphasis added).  The term "rough equivalent" is not a magical incantation that spellbinds us to apply the compensatory tax doctrine.  It is, instead, a term whose meaning must be determined in context.  See Towne v. Eisner, 245 U.S. 418, 425, 38 S. Ct. 158, 159

24

(1918) (Holmes, J.) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").

CSX's next argument for applying the compensatory tax doctrine is that the Supreme Court signaled that we should do so by citing Gregg Dyeing, which CSX characterizes as the "foundational building block of the compensatory tax analysis."  According to CSX, Gregg Dyeing is cited "as shorthand for the Compensatory Tax Doctrine" by many courts, and it points to the Alabama Supreme Court's opinion in White v. Reynolds Metals Co., 558 So. 2d 373 (Ala. 1989), as an example.

That is not a good example for CSX because in White the Alabama Supreme Court did not use Gregg Dyeing as "shorthand for the Compensatory Tax Doctrine," but simply cited it along with two other decisions for the proposition that the "United States Supreme Court has upheld taxing statutes that appeared to discriminate against interstate commerce by holding that the state's tax scheme compensated for the tax by a substantially equivalent tax on intrastate commerce." Id. at 387.  And even if the Alabama Supreme Court had used Gregg Dyeing as code for the compensatory tax doctrine, that would not mean the United States Supreme Court used it that way in this case.  We apply to the Supreme Court's opinions some of the same interpretative principles that it applies to congressional

enactments, including the one about elephants and mouseholes.  Whitman, 531

U.S. at 468, 121 S. Ct. at 909–10.  We don't read the citation to Gregg Dyeing in

the CSX II opinion as code but as simply a reference to the general principle that

courts should consider other taxes a state imposes when assessing a facially

discriminatory tax for 4-R Act purposes.  See CSX II, 135 S. Ct. at 1143–44.

Third, CSX argues that failure to apply the compensatory tax doctrine would

"lead[ ] to absurd results."  We may deviate from the plain meaning of a statute

only if "the result produced by the plain meaning" is "truly absurd."  Merritt v.

Dillard Paper Co., 120 F.3d 1181, 1188 (11th Cir. 1997).  According to CSX,

because the dormant Commerce Clause "aris[es] from a negative implication

imposed by case law" instead of "an express statutory prohibition" like the 4-R

Act, we should scrutinize taxes that might violate the 4-R Act more rigorously than

taxes that might violate the dormant Commerce Clause.  Absurdity ensues, CSX

asserts, if it is "easier to justify a facially discriminatory tax that violates a federal

statute than it is to justify a facially discriminatory tax that violates the dormant

Commerce Clause."  What?

The posited result does not strike us as "truly absurd" — or even absurd

without an adverb, for that matter.  Id.  Although the dormant Commerce Clause

26

has been criticized,[7] the Supreme Court has held that it is grounded in the Constitution.  See Fulton Corp., 516 U.S. at 330, 116 S. Ct. at 853 ("The constitutional provision of power '[t]o regulate Commerce' . . . has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority.").  The economic protectionism that doctrine seeks to curb is a problem that "plagued relations among the Colonies and later among the States under the Articles of Confederation."  Dep't of Revenue v. Davis, 553 U.S. 328, 338, 128 S. Ct. 1801, 1808 (2008).  What seems truly absurd to us is the premise of CSX's assertion, which is that a constitutional doctrine is inherently less important than a statutory provision.

3.  The Excise Tax Is Roughly Equivalent to the Sales and Use Tax

Having established that how a state allocates tax revenue is immaterial to whether two taxes are roughly equivalent under § 11501(b)(4), and that the Supreme Court did not direct us to apply the compensatory tax doctrine, we turn to the district court's ruling that the sales and use tax and the excise tax are roughly equivalent.

---

[7] See, e.g., Comptroller of the Treasury of Md. v. Wynne, 575 U.S. __, 135 S. Ct. 1787, 1808 (2015) (Scalia, J., dissenting) ("[T]he negative Commerce Clause is a judicial fraud . . . ."); United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 349, 127 S. Ct. 1786, 1799 (2007) (Thomas, J., dissenting) ("The negative Commerce Clause has no basis in the Constitution and has proved unworkable in practice.").

27

As an initial matter, the parties contest whether we should compare the rates that rail carriers and motor carriers pay in state taxes, or the combined rate they pay under state plus local taxes. We need not answer that question because the sales and use tax and the excise tax are roughly equivalent regardless of whether we consider local taxes. Considering only state taxes, over a recent nine-year period, rail carriers paid $0.0985 per gallon for dyed diesel while motor carriers paid $0.19 per gallon for clear diesel. CSX Transp., 247 F. Supp. 3d at 1250. Accounting for both state and local taxes, rail carriers paid $0.2348 per gallon while motor carriers paid between $0.20 and $0.23 per gallon. Id. During that same period, rail carriers and motor carriers each had a higher state plus local tax burden than the other one did an equal number of times (fifty-seven). Id. at 1246.

We agree with the district court that "roughly equivalent" bears its ordinary meaning and that two taxes are roughly equivalent if the rates they impose approximate one another. See id. at 1248. It does not mean "perfectly equivalent." Because the average rates that rail carriers and motor carriers paid differed only "by some quantity between less-than-half-of-one cent and 3.5 cents" per gallon, favoring one as many times as the other, id. at 1250–51, the district court correctly concluded that the excise tax is roughly equivalent to the sales and use tax. As a result, the excise tax "justifies the motor carrier sales-tax exemption." CSX II, 135 S. Ct. at 1144.

28

## V.  THE WATER CARRIER EXEMPTION

We now move from the roads to the waters.  The Supreme Court recognized that, unlike the motor carrier exemption, the State could offer no rough equivalency justification for the water carrier exemption because water carriers pay no state taxes at all when they buy or consume diesel to haul freight interstate. Ala. Code §§ 40-23-4(a)(10) (sales tax exemption), 40-23-62(12) (use tax exemption).  The State did, however, offer "other justifications for the water carrier exemption — for example, that such an exemption is compelled by federal law" — and the Court remanded for consideration of those "alternative rationales."  CSX II, 135 S. Ct. at 1144.

The district court ruled that the water carrier exemption for interstate shipments does not violate the 4-R Act for two independent reasons.  First, the court found that there was no violation because "CSX has suffered no competitive injury from the State's exemption of water carriers from the sales [and use] tax." CSX Transp., 247 F. Supp. 3d at 1255.  Second, the court found that because "imposition of a state sales [and use] tax on interstate water carriers would expose the State to liability under the negative Commerce Clause," the exemption for water carriers "is compelled by federal law."  Id. at 1252 (citing CSX II, 135 S. Ct. at 1144).  We will take those two up in that order.

### A.  The District Court's Competitive Injury Ruling

There are two problems with the district court's ruling that the water carrier exemption does not violate the 4-R Act because CSX has not shown that the exemption causes it competitive injury.  The first problem is that the parties stipulated that water carriers are among "[t]he principal competitors to rail carriers in the transportation of property in interstate commerce in the State of Alabama."  Although a district court may set aside an erroneous stipulation where justice requires, see, e.g., Morrison v. Genuine Parts Co., 828 F.2d 708, 709 (11th Cir. 1987), the district court did not suggest that it thought justice required doing so.  Instead, its rationale was that the "stipulation does not equate to a concession that the competition between CSX and water carriers is substantial."  CSX Transp., 247 F. Supp. 3d at 1245.  We are hard pressed to square a finding that competition between CSX and water carriers is insubstantial with a stipulation that they are "principal competitors," especially where the stipulation distinguishes "[a]ir carriers," which "also are engaged in the transportation of property in interstate commerce in the State of Alabama, but only marginally compete with rail carriers."

And we are supremely reluctant to allow a district court to relitigate a stipulated fact that the Supreme Court relied on for one of its holdings, which is that rail carriers and water carriers are a similarly situated comparison class.  CSX

II, 135 S. Ct. at 1143 ("[I]n light of [CSX's] complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appropriate . . . .") (emphasis added).

The second problem with the district court's ruling is that it is contrary to the Supreme Court decisions in CSX I and CSX II. While neither of those decisions explicitly held that competitive injury was not required, the two of them combined decided that discriminatory taxation had been shown and that the remaining question to be answered on remand was whether there was sufficient justification for it. CSX I, 562 U.S. at 288 & n.8, 131 S. Ct. at 1109 & n.8 ("[A] state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4)[,]" but the State may "offer[ ] a sufficient justification for declining to provide the exemption at issue to rail carriers."); CSX II, 135 S. Ct. at 1143–44 (holding that rail carriers and water carriers are similarly situated competitors and remanding for us to determine "whether Alabama's alternative rationales justify its exemption"). Competitive injury may play an important role in antitrust law but under the 4-R Act the lack of it is not a justification for discriminatory taxes.

Instead of putting the burden on the State to justify the difference in taxation, the district court put the burden on CSX to prove "discriminatory effect" or "competitive injury." CSX Transp., 247 F. Supp. 3d at 1255. While the district

31

court was "free to address, as a matter of first impression, those issues not disposed of on appeal," Cox Enters., 794 F.3d at 1271, it was not free to add another element for CSX to prove in order to establish a violation of the Act.[8]

## B.  The District Court's "Compelled by Federal Law" Ruling

In remanding the case the Supreme Court recognized that if the water carrier exemption were "compelled by federal law," that might be sufficient justification. CSX II, 135 S. Ct. at 1144.  The district court concluded that "imposition of a state sales [and use] tax on interstate water carriers would expose the State to liability under the negative Commerce Clause," and for that reason, "the exemption for water carriers 'is compelled by federal law.'"  CSX Transp., 247 F. Supp. 3d at 1252 (citing CSX II, 135 S. Ct. at 1144).

As an initial matter, we disagree with the district court that the water carrier exemption is "compelled by federal law" merely because the "imposition of a state sales [and use] tax on water carriers would expose the State to liability" under the

---

[8]  The State contends that even if proof of injury is unnecessary to establish a violation of the 4-R Act, it is necessary for injunctive relief.  That argument goes against the decisions of five of our sister circuits that have held the "irreparable injury" requirement does not apply to 4-R Act claims because the Act authorizes injunctive relief without it where the statutory conditions are satisfied.  49 U.S.C. § 11501(c).  See Consol. Rail v. Town of Hyde Park, 47 F.3d 473, 479 (2d Cir. 1995); CSX Transp., Inc. v. Tenn. State Bd. of Equalization, 964 F.2d 548, 551 (6th Cir. 1992); Burlington N. R.R. v. Bair, 957 F.2d 599, 601–02 (8th Cir. 1992); Burlington N. R.R. v. Dep't of Revenue, 934 F.2d 1064, 1074–75 (9th Cir. 1991); Atchison, T. & S.F. Ry. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981).  Although we have not addressed this issue in the 4-R Act context, we follow the principle that when "an injunction is authorized by statute and the statutory conditions are satisfied the usual prerequisite of irreparable injury need not be established."  Gresham v. Windrush Partners, 730 F.2d 1417, 1423 (11th Cir. 1984) (citations and alteration omitted).

32

Commerce Clause.  Id. (emphases added).  For 4-R Act justification purposes

exposure to a risk is not compulsion; compulsion requires legal obligation.

### 1.  The Negative Commerce Clause

The Supreme Court applies a four-prong test to determine whether a state

tax violates the Commerce Clause.  See Complete Auto Transit, Inc. v. Brady, 430

U.S. 274, 279, 97 S. Ct. 1076, 1079 (1977).  A state tax survives Commerce Clause

scrutiny if it "[1] is applied to an activity with a substantial nexus with the taxing

State, [2] is fairly apportioned, [3] does not discriminate against interstate

commerce, and [4] is fairly related to services provided by the State."  Id.  All four

requirements must be met.  The district court's ruling that the Commerce Clause

compels the water carrier exemption was based on the fourth requirement alone,

CSX Transp., 247 F. Supp. 3d at 1251–52, and the State does not contend that any

of the first three were not met.  As a result, we consider only the "fairly related" or

fourth requirement.[9]

---

[9] We have not previously applied the Complete Auto test because the Eleventh
Amendment and the Tax Injunction Act ordinarily prevent lower federal courts from deciding
constitutional challenges to state taxes.  See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S.
356, 363, 121 S. Ct. 955, 962 (2001) ("The ultimate guarantee of the Eleventh Amendment is
that nonconsenting States may not be sued by private individuals in federal court."); 28 U.S.C.
§ 1341 ("The district courts shall not enjoin . . . collection of any tax under State law where a
plain, speedy and efficient remedy may be had in the courts of such State.").  But neither the
Eleventh Amendment nor the Tax Injunction Act forbids us from deciding whether imposing the
sales and use tax on water carriers would violate the Commerce Clause.  The Supreme Court's
remand instructions require us to decide that hypothetical case within this case to determine
whether the water carrier exemption is "compelled by federal law."  CSX II, 135 S. Ct. at 1144.

The district court ruled that if imposed on water carriers the sales and use tax would not be fairly related to services that the State provides them because Alabama "provides virtually no services to interstate water carriers." Id. at 1252. It found that Alabama "spends no tax dollars on river maintenance projects" or "commercial water traffic regulation or enforcement." Id. It is, instead, the federal government that "funds all river dredging and lock and dam maintenance" and "spends monies licensing, policing, and maintaining commercial water traffic." Id. Because "water carriers impose virtually no financial burden on the State" and "may never contact state land," the district court concluded that water carriers could challenge the sales and use tax as not "fairly related to services provided [them] by the State." Id. at 1251–52. Because imposition of the sales and use tax "would expose the State to liability under the negative Commerce Clause," the district court ruled the water carrier exemption is "compelled by federal law" under the CSX II decision. Id. at 1252.

That ruling doesn't hold water. The Supreme Court rejected similar reasoning in Commonwealth Edison Co. v. Montana, 453 U.S. 609, 620–21, 101 S. Ct. 2946, 2955 (1981). That decision involved a Montana severance tax of up to 30% imposed on coal extracted in the state for use outside it. Id. at 612–13, 101 S. Ct. 2951. The coal producers argued that the "amount collected under the Montana tax is not fairly related to the additional costs the State incurs because of

34

coal mining."[10]  Id. at 620, 101 S. Ct. at 2955.  The Court was not persuaded,

explaining that the fourth prong of the Complete Auto test does not require "that

the amount of general revenue taxes collected from a particular activity . . . be

reasonably related to the value of services provided to the activity."  Id. at 622, 101

S. Ct. at 2956.  "Nothing is more familiar in taxation than the imposition of a tax

upon a class or upon individuals who enjoy no direct benefit from its expenditure,

and who are not responsible for the condition to be remedied."  Id. (internal

citations omitted); see also Okla. Tax Comm'n v. Jefferson Lines, Inc., 514 U.S.

175, 199, 115 S. Ct. 1331, 1345 (1995) ("The fair relation prong of Complete Auto

requires no detailed accounting of the services provided to the taxpayer on account

of the activity being taxed, nor, indeed, is a State limited to offsetting the public

costs created by the taxed activity.").

Instead, the fourth prong requires only that "the measure of a tax [be]

reasonably related to the taxpayer's activities or presence in the State," in which

case "the taxpayer will realize, in proper proportion to the taxes it pays, the only

benefit to which the taxpayer is constitutionally entitled:  that derived from his

enjoyment of the privileges of living in an organized society."  Commonwealth

Edison, 453 U.S. at 628–29, 101 S. Ct. at 2959 (quotation marks and alterations

---

[10] The coal producers asserted that the "legitimate local impact costs [of coal mining] . . . might amount to approximately 2 [cents] per ton, compared to present average revenues from the severance tax alone of over $2.00 per ton."  Id. at 620 n.10, 101 S. Ct. at 2955 n.10.

omitted).  Those privileges are the "services" to which a tax must be "fairly

related" for Commerce Clause purposes, and they include "police and fire

protection," public roads and mass transit, and other "advantages of a civilized

society."  Id. at 624, 101 S. Ct. at 2957.  Applying that analysis, the Court had

"little difficulty" upholding the Montana tax.  Id. at 626, 101 S. Ct. at 2958

("Because [the tax] is measured as a percentage of the value of the coal taken, the

Montana tax is in proper proportion to appellants' activity within the State and,

therefore, to their consequent enjoyment of the opportunities and protections which

the State has afforded in connection with those activities.") (quotation marks

omitted).

Under the Commonwealth Edison standard, a tax on water carriers would be

"fairly related" to the services provided by the State.  It makes no difference that

the federal government, instead of the State, foots the bill for barge-related services

like river maintenance projects and commercial water traffic.  The standard is

unconcerned with "the services provided to the taxpayer on account of the activity

being taxed."  Jefferson Lines, 514 U.S. at 199, 115 S. Ct. at 1345.  Instead, the

services to which a tax must be "fairly related" are the "privileges of living in an

organized society."  Commonwealth Edison, 453 U.S. at 629, 101 S. Ct. at 2959.

Water carriers purchasing or using diesel fuel in Alabama benefit from those

privileges.  That is doubtless true for the two categories of water carriers that,

36

according to the record, regularly make landfall in Alabama.  For example, water carriers engaged in "head-to-head competition" with CSX take product from feed mills "located between Decatur[, Alabama] and Guntersville[, Alabama] directly on the river system."  Water carriers engaged in "river-to-truck competition" transport product from out of state to Albertville, Alabama and Ivalee, Alabama, where they "transfer [the product] and then truck it into their facilities."  Those water carriers benefit from the State's provision of emergency services, access to the judicial system, roads, and other "advantages of civilized society," no matter how often they use those services.  See Jefferson Lines, 514 U.S. at 200, 115 S. Ct. at 1346 ("The bus terminal may not catch fire during the sale, and no robbery there may be foiled while the buyer is getting his ticket, but police and fire protection, along with the usual and usually forgotten advantages conferred by the State's maintenance of a civilized society, are justifications enough for the imposition of a tax.").

Even for water carriers that "may never contact state land," CSX Transp., 247 F. Supp. 3d at 1252, the fact that they could call upon the State to render aid in case of an emergency or use the state courts to vindicate their rights means that they derive some benefit, however attenuated, from the State's services.  An attenuated benefit is all the fourth requirement of the Complete Auto test requires, which makes it unsurprising that the Supreme Court has never invalidated a state

tax under that requirement.  See, e.g., Jefferson Lines, 514 U.S. at 200, 115 S. Ct. at 1346.  Justice Blackmun may have been right when he said that Commonwealth Edison had gone so far as to "emasculate" the fairly related requirement of the Complete Auto test, 453 U.S. at 645, 101 S. Ct. at 2967–68 (Blackmun, J., dissenting), but whether it is an emasculator or not, Commonwealth Edison is the law and we follow it.

The question then is whether the "measure of the tax [is] reasonably related to the extent of [water carriers'] contact" with the state.  Commonwealth Edison, 453 U.S. at 626, 101 S. Ct. at 2958.  Because the severance tax in Commonwealth Edison was "measured as a percentage of the value of the coal taken," the Supreme Court held that it was "in proper proportion to appellants' activities within the State."  Id.  Likewise, if applied to water carriers hauling freight interstate Alabama's sales and use tax, which is proportionate to the amount of diesel fuel bought or used in the state, would also be "in proper proportion to [the water carrier's] activities within the state."  Id.; see Ala. Code §§ 40-23-2(1), 40-23-61(a).  As a result, imposing the sales and use tax on water carriers would not offend the Commerce Clause and exempting those carriers from the tax cannot be justified on the basis that it would.[11]  See CSX Transp., 247 F. Supp. 3d at 1252.

---

[11] The State and district court cite an Illinois appellate court decision that applied the fourth requirement of Complete Auto more strictly.  See  CSX Transp., 247 F. Supp. 3d at 1252

38

2. The Maritime Transportation Security Act

The State points to another federal law as compelling the water carrier

exemption, arguing that taxing them could expose it to suit under the Maritime

Transportation Security Act, 33 U.S.C. § 5(b).  That statute provides:

> No taxes . . . shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters[.]

33 U.S.C. § 5(b).  Taxing water carriers would expose it to suit for violating § 5(b),

the State asserts, because the sales and use tax would be a "tax . . . collected from

any vessel or other water craft, or from its passengers or crew by [a] non-Federal

interest."  Id.  But, as we have already explained, exposure to a lawsuit alone is not

compulsion under CSX II.

And any such a lawsuit would not, in our view, succeed.  The State bases its

fears primarily on Kittatinny Canoes, Inc. v. Westfall Township, No. 183 CV

2013, 2013 WL 8563483 (Pa. Com. Pl. May 6, 2013), and Moscheo v. Polk

_____

n.18 (citing Am. River Transp. Co. v. Bower, 813 N.E.2d 1090, 1094 (Ill. App. Ct. 2004) (finding "no fair relation between the use tax and the benefits that [the tugboat company] received from the state for the use by its line haul tugboats of the navigable waterways of the United States")).  We are not bound by one decision of one state appellate court about whether one tax imposed on one type of boat violates the Commerce Clause.  See Lewis v. Casey, 518 U.S. 343, 379 n.7, 116 S. Ct. 2174, 2194 n.7.  And for reasons we have discussed, we agree with Judge Bowman's dissenting observation in Bower, 813 N.E.2d at 1094–95, that the majority in that case took too strict a view of the fourth requirement.

39

County, No. E2008-01969-COA-R3-CV, 2009 WL 2868754 (Tenn. Ct. App. Sept. 2, 2009). Both decisions struck down under § 5(b) state taxes on recreational activities on waterways. Kittatinny, 2013 WL 8563483, at *9; Moscheo, 2009 WL 2868754, at *1. The district court found those decisions "not helpful" because they involved the taxation of passengers of vessels on navigable waters. CSX Transp., 247 F. Supp. 3d at 1253. In rejecting this proffered justification for exempting the water carriers from the sales and use tax, the district court ruled that § 5(b) does not apply to taxes imposed on things other than "the vessel, its passengers, or crew." Id. We agree.

If as the State suggests § 5(b) of the Maritime Transportation Security Act invalidates the sales and use tax — which applies to diesel fuel because it is "tangible personal property," see Ala. Code § 40-23-2(1) — it would forbid states from taxing the purchase of any tangible property for use on or by a "vessel . . . its passengers[,] or crew," 33 U.S.C. § 5(b). Under that view states could not collect sales or use taxes when a boat purchases porcelain pitchers for a dinner cruise or mattresses for the berths or any other property for any other reason. Water carriers would become floating tax free zones.

Properly construed, the Act forbids taxes imposed on the vessel itself, or on its crew members themselves, or on the passengers themselves — not taxes imposed on property purchased for use on or by a vessel, or by its crew, or by its

40

passengers.  See, e.g., Commercial Barge Line Co. v. Dir. of Revenue, 431 S.W.3d 479, 484 (Mo. 2014) (holding that there was no violation of the Act where the state "assess[ed] sales and use tax on the goods and supplies delivered to the Taxpayers' towboats while they [were] in Missouri"); Reel Hooker Sportfishing, Inc. v. Dep't of Taxation, 236 P.3d 1230, 1232 (Haw. Ct. App. 2010) ("33 U.S.C. § 5(b) does not preempt the assessment of [Hawaii's general excise tax] because [it] is a tax assessed on gross business receipts for the privilege of doing business in Hawai'i, and is not a tax on their vessels or passengers.").

If exempting water carriers from the sales and use tax that rail carriers pay is to be justified, it must be on some basis other than the Commerce Clause or the Maritime Transportation Security Act.  The State has some more possibilities.

## C.  Other Justifications

The State advances two more arguments to justify the water carrier exemption:  (1) "States can seek to avoid double taxation"; and (2) "States can charge a higher tax on a party that imposes higher costs on the State than its comparison class does."  Neither argument persuades us.

## 1.  Double Taxation

The State argues that the water carrier exemption is justified because water carriers pay $0.29 per gallon in federal tax in exchange for barge-related services.  26 U.S.C. § 4042(b).  Because water carriers benefit from "federal, not state,

41

services," the State asserts that it is justified in "allowing water carriers to be taxed solely by the federal government" to avoid "double taxation."

The State cites only one decision in support of its avoiding double taxation argument. See Lawrence v. State Tax Comm'n, 286 U.S. 276, 279, 52 S. Ct. 556, 556 (1932). The Lawrence decision upheld a Mississippi income tax that exempted out-of-state income of corporations but not of individuals. The Court held that "a rational basis for the distinction made[ ] is the fact that the state has adopted generally a policy of avoiding double taxation of the same economic interest in corporate income, by taxing either the income of the corporation or the dividends of its stockholders, but not both." Id. at 284, 52 S. Ct. at 558–59 (emphasis added). Notably, the State omitted the part of the quotation to which we have added emphasis. With that important language out of mind, the State suggests that Lawrence stands for the proposition that a state's interest in "avoiding double taxation" includes not taxing income or activities that the federal government taxes. But the decision cannot stand for that proposition because the case did not involve it.

Lawrence involved a state's effort to avoid imposing two taxes on the same corporate income — once as the income comes into the corporation and again as that same income goes out as dividends. Id. at 284, 52 S. Ct. at 558–59. It did not involve, as this case does, a state tax and a federal tax that are of different types

42

and serve different purposes. See 26 U.S.C. § 4042(b); Ala. Code § 40-23-2(1).

For that reason, imposing the sales and use tax on water carriers would not qualify

as "double taxation" under Lawrence or any of the three dictionary definitions of

that term.[12]

And even if imposing a state tax and a federal tax that are measured in

different ways and used for different purposes did qualify as "double taxation," the

State offers no evidence that it has "adopted generally a policy of avoiding double

taxation," which is necessary for two taxes to fall under Lawrence. See 286 U.S. at

284, 52 S. Ct. at 558. Indications are that it does not have a policy of not taxing

what the federal government taxes. For example, the State imposes an excise tax

on diesel fuel that motor carriers purchase even though the federal government

does too. See Ala. Code § 40-17-325(a)(2); 26 U.S.C. § 4081. The State cannot

treat a federal and a state tax as one tax if by land, two if by sea. And, of course,

the federal income tax has not dissuaded the State from taxing income. See Ala.

Code § 40-18-2(a). For these reasons, the State's reliance on Lawrence is

misplaced and the federal excise tax on diesel fuel does not justify the exemption

---

[12] See Double taxation, Black's Law Dictionary (10th ed. 2014) ("1. The imposition of two taxes on the same property during the same period and for the same taxing purpose. 2. The imposition of two taxes on one corporate profit . . . 3. Int'l law. The imposition of comparable taxes in two or more states on the same taxpayer for the same subject matter or identical goods.").

43

of water carriers from the State's sales and use tax on diesel fuel used for the interstate shipment of freight.

## 2. Disparate Burdens

The State also argues that the water carrier exemption is justified because water carriers "impose virtually no financial burden on the State" while rail carriers impose significant costs. The disparity in burdens, the State asserts, justifies the disparity in taxation.

The State relies on Oregon Waste, 511 U.S. 93, 114 S. Ct. 1345. That is a dormant Commerce Clause decision invalidating a regulatory scheme that imposed a "purportedly cost-based surcharge" of $0.85 per ton on the disposal of waste generated in-state and a $2.25 per ton surcharge on the disposal of waste from out of state. Id. at 95–96, 114 S. Ct. at 1348. Oregon did not argue that out-of-state waste imposed higher costs, nor did it contend it had considered any cost disparity when it fixed the surcharge rates. Id. at 101 & n.5, 114 S. Ct. at 1351 & n.5. In a footnote, the Supreme Court theorized that if out-of-state waste imposed higher costs on the State, the scheme would pass muster because the surcharge disparity would not be based impermissibly on the waste's origin but would instead be calibrated to cost. Id.

The Oregon Waste decision does not control here. The Court's footnote musing about what might have been if something were different is doubtless dicta.

44

See Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010).  And in any event, Oregon Waste is oceans apart from this case.  Because that case involved a dormant Commerce Clause challenge, the issue was whether a state law impermissibly discriminates against out-of-staters.  See, e.g., Maine v. Taylor, 477 U.S. 131, 137–38, 106 S. Ct. 2440, 2446–47 (1986).  Its holding does not apply to a tax that does not discriminate against out-of-state economic interests.

Even if we could draw on dormant Commerce Clause decisions in deciding this 4-R Act case, the Oregon Waste dicta does not shed light on the sales and use tax at issue here.  In that dicta the Court noted that evidence about disparate costs might salvage a facially discriminatory "cost-based surcharge."  511 U.S. at 95, 101 n.5, 114 S. Ct. at 1348, 1351 n.5.  But a sales and use tax is not "cost-based" — it is not calibrated to account for varying burdens.  See CSX Transp., 247 F. Supp. 3d at 1254.  Instead, it is a flat-rate, 4% general tax imposed without reference to burdens generated by the activity and borne by the State.  There is no evidence that the State accounted for disparate burdens when it set a tax rate of 4% for rail carriers and 0% for water carriers.  As a result, the Oregon Waste Court's conjecture that a cost disparity might justify a proportionally disparate "cost-based surcharge" does not mean that one might justify exempting water carriers from a flat-rate tax of general applicability.

Because the sales and use tax does not account for the relative burdens imposed by taxpayers, and because dicta from the dormant Commerce Clause decision in Oregon Waste does not control the result in this 4-R Act case, the State's "disparate burdens" argument does not justify the water carrier exemption. Having concluded that the water carrier exemption is not "compelled by federal law" and that neither of the State's "alternative rationales" justifies the water carrier exemption, see CSX II, 135 S. Ct. at 1144, we hold that Alabama's sales and use tax violates the 4-R Act.

## VI. CONCLUSION

As to motor carriers, we agree with the district court that the excise tax is roughly equivalent to the sales and use tax because the average rates that rail carriers and motor carriers have paid differed "by some quantity between less-than-half-of-one cent and 3.5 cents" per gallon. CSX Transp., 247 F. Supp. 3d at 1250–51. As a result, the excise tax justifies the motor carrier exemption from the sales and use tax. See CSX II, 135 S. Ct. at 1144.

As to water carriers, their exemption is not "compelled by federal law." CSX Transp., 247 F. Supp. 3d at 1252. Although imposing the sales and use tax on water carriers transporting freight interstate might "expose" the State to a lawsuit under federal law, compulsion requires more than exposure. The water carrier exemption is "compelled by federal law" only if imposition of the sales and

46

use tax would violate federal law.  In our view, it would not.  And we are unpersuaded by the State's "alternative rationales" for the water carrier exemption. See CSX II, 135 S. Ct. at 1144.

CSX is entitled to relief from the State's discrimination that violates the 4-R Act.  The relief the district court fashions should leave the State some discretion in remedying the tax discrimination.  For example, the State could repeal the water carrier exemption, in which case water carriers and rail carriers would both pay the sales and use tax when they buy or use diesel fuel for interstate hauls.  Or the State could retain the water carrier exemption and exempt rail carriers when they buy or use diesel fuel for interstate hauls.  Either way, the State would not be imposing a tax "that discriminates against a rail carrier."  49 U.S.C. § 11501(b)(4).[13]

We **REVERSE** the judgment of the district court, hold that the State's sales and use tax on the purchase or use of diesel fuel for interstate shipment of freight violates the 4-R Act, and **REMAND** to the district court with instructions to enter declaratory and injunctive relief in favor of CSX consistent with this opinion.[14]

---

[13] The State's rehearing petition noted that the day after it was filed would be "this litigation's Tenth Anniversary" and predicted that "[n]o one will celebrate" it.  Perhaps there was celebration by those attorneys who were paid by the hour.  We have not been, so our celebration is limited to the fact that we have done our duty of deciding an appeal involving this dispute (once again).  We have done so with the hope that this litigation is one step closer to the end of the line.  It's time to put this one in the shed.

[14] Given our revisions, the mandate in this appeal will not be issued for 21 days after the issuance of this opinion, which will allow either party to file a new petition for rehearing, to the

---

panel or for en banc review, if it wishes to do so.  Cf. Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1248 (11th Cir. 2017).